Burns *et al. v.* The Beck & Gregg Hardware Company, and *vice versa.*

83  471
95  448
83  471
e119 993

1. Where two persons, after procuring a charter, organized the corporation without subscribing minimum capital stock or paying in the ten per cent. required by statute, then proceeded to business, contracted debts, and made a fraudulent assignment of the corporate assets, the creditors on filing a bill to set aside the assignment and make the corporators as well as the corporation liable, charging the corporation with fraud, had a right to proceed against all the defendants. The bill was not multifarious; there was no misjoinder of parties defendant or of causes of action.

2. Generally, reference to a master is discretionary with the court. Refusal to refer in the present case was not error.

3. To a creditors' bill, new parties complainant belonging to the class in whose behalf the bill was filed, may be made whilst the trial is in progress, and if their claims are undisputed, their coming in at that stage will be no cause for suspending the trial or for granting a continuance at the instance of defendants.

4. The schedule of assets and that of creditors must be verified separately, that is, by separate affidavits, or the assignment will be void.

5. The evidence warranted the findings of the jury as to all material matters of fact.

6. As a matter of law, when the stock of a corporation is not subscribed for up to the minimum amount of capital fixed by the charter, and none of it is paid in, if the corporators organize, elect themselves officers, proceed to business, contract debts up to and beyond the nominal capital, having paid in nothing whatever, they commit a legal fraud by so doing, and are liable to creditors to make good the minimum capital, together with interest thereon, should this be necessary to discharge the corporate debts.

7. In such case, the corporators are not entitled to retain amounts drawn by them from corporate assets under the name of salary to themselves as officers, it not appearing that the corporation made any profits out of which to pay salaries, and nothing having been paid in on the capital stock.

8. Other points presented by the motion for a new trial show no reversible error.

October 21, 1889.

Stock and stockholders. Corporations. Equity. Debtor and creditor. Auditors. Parties. Continuance. Assignments. Fraud. Interest. Before Judge

Marshall J. Clarke. Fulton superior court. September term, 1888.

On October 11, 1887, the Beck & Gregg Hardware Company brought its bill, on behalf of itself and such other creditors as might come in and be made parties, against the Atlanta Construction Company, a corporation, and J. C. Kimball, alleging, in brief, as follows: The Construction Company is indebted to complainant $402.11 on an account past due and unpaid. It is insolvent, and on October 10, 1887, made to Kimball an assignment which is void. Kimball has taken possession under the same, and is proceeding to execute it, and will do so unless restrained. The assignment in its body gives no preferences, but attached to it is a sheet pretending to give preferences to a large amount, to which no reference is made in the body of the assignment; and complainant has reason to believe that Kimball will attempt to treat the sheet as part of it. There is no complete schedule of the assets of the corporation, because there is no statement of the amount due the corporation by the stockholders, W. H. Parkins and J. A. Burns, for unpaid stock. The capital stock of the corporation was $10,000, and Burns stated to the secretary and treasurer of complainant that only 40 per cent. of it was paid up; this would leave $6,000 unpaid, which nowhere appears on the schedule or in the assignment. The corporation had no power to transact any business at all, because 10 per cent. of the capital stock had not been paid up as required by law. The schedule of assets in the assignment shows a liability from Parkins and Burns, stockholders of the company, amounting to a little over $4,000, represented by the promissory notes of said stockholders due at a long time in the future, which notes complainant charges represented, the 40 per cent. that they claimed to have paid. Complainant waives discovery and prays

injunction against Kimball, appointment of a receiver, and a recovery from the corporation of the amount of its claim, etc.

Defendants answered on October 15, 1887, admitting the indebtedness of the corporation as such to complainant, that it was insolvent, that it had made an assignment, and that the assignee had accepted the same, had taken possession of the property of the corporation, and unless prevented, would carry out the provisions of the assignment. They alleged that the apparent indebtedness of the corporation was $15,090.25, but that certain notes, drafts and checks were duplicates of amounts due on account, making its actual indebtedness $9,429.01. The deed of assignment was written on both sides of separate leaves or sheets of paper, and was improperly put together, so that the preferences on an attached sheet (to which no reference is made in the assignment) were really a part of the body of the assignment. Kimball and Parkins both read the assignment in its regular order before it was signed by them, and understood the preferences as being therein named, and Kimball also understood the same when he accepted the trust. The construction company was incorporated on May 7, 1887, after all legal preliminaries had been complied with. On May 9, 1887, its charter was duly accepted, the company was organized,' and Parkins was elected president. He had subscribed for five shares of $100 each, J. A. Burns for four, and E. P. Burns, his son, for one; each paid in full for his stock, making a total of $1,000 in cash, which was 10 per cent. of the minimum of capital stock allowed by the charter, and after that, and not before, it began business as such corporation, and all debts have been incurred since then by it as a corporation. On May 10, 1887, J. A. Burns bought out the interest of his son, and now he and Parkins stand as the stockholders. No

other stock than said ten shares was then subscribed
for, and nothing was due thereon from anybody. On
May 16, 1887, Burns and Parkins each subscribed for
fifteen shares of the stock, each giving six promissory
notes payable to the order of the corporation, due re-
spectively a year and seven months, two years, two
years and seven months, three years, three years and
seven months, and four years after date. The corpora-
tion took said notes in payment for the stock, and has
since regarded them as fully paid. The conversation
alluded to in the bill was in reference to these forty
shares, and occurred after complainant's debt against
the corporation had been contracted. None of the
stock was ever subscribed for except these forty shares.

Complainant amended its bill, attaching a copy of
the deed of assignment, and charging, among other
things, that Parkins and Burns were the only stock-
holders of the construction company, one its president
and the other its secretary, and that neither of them
ever paid in any of their subscription for the capital
stock but gave their notes for the same payable to the
company and due at long distances in the future, which
was a fraud upon complainant and the creditors of the
company, with which complainant dealt in good faith,
believing it had a *bona fide* capital stock of $10,000;
and the contrary fact and the giving of the notes were
kept secret by Parkins and Burns; and therefore they
have made themselves liable to the creditors of the com-
pany for the entire indebtedness incurred by them, and
are at least responsible to the extent of $10,000, the
amount of capital stock provided for in the charter;
and complainant prays that they be made parties de-
fendant, and for decree against them for the amount of
its claim; and that certain persons claimed to be pre-
ferred creditors under the deed of assignment be made
parties defendant to the bill. They were so made on

November 8, 1887, the amendment having been filed October 27, 1887. Attached was a copy of the deed of assignment, bearing date October 10, 1887, and reciting that it had attached to it as exhibit A a full and complete inventory and schedule of all indebtedness of every kind of the corporation, sworn to by W. H. Parkins, its chief officer. It purported to convey all of the property of that corporation, fully set forth in exhibit B, said to contain a full and complete inventory and schedule of all the assets of every kind, which schedule also was sworn to by Parkins, president. It contained direction to the assignee to convert the assets into cash and pay all costs and charges of executing the assignment, and "to pay and discharge in full the following debts and charges, to wit." Then followed the signatures of the corporation by Parkins, its president, and of Kimball, duly attested, and then a statement of the names of a number of creditors, and a further direction to the assignee to pay out of the residue of the proceeds, if sufficient, all the other debts and liabilities, and if not sufficient, to apply the residue ratably to the debts, etc. The two exhibits appeared to be a schedule of creditors and a list of assets. In the latter are mentioned a promissory note for $1,109.60, made by Parkins, dated October 8, 1887, payable on or before five years after date, and the six promissory notes made by Parkins and the six made by Burns, before mentioned. Only one affidavit was made to the deed; it was made by Parkins and was, "that the facts stated in the foregoing deed of assignment contain a full and complete inventory and schedule of all indebtedness of every kind of said Atlanta Construction Company at this date, the time of the execution of said deed of assignment, and that said inventory and schedule sets forth in detail the names, the amounts due to and residence of each of the creditors of said company. He further

swears that exhibit B, attached to the said assignment at the time of the execution of the same, is a full and complete inventory and schedule of all the amounts of every kind held, claimed and owned by said company at the time, to wit, the time of the execution of said deed of assignment."

On November 9, 1887, complainant further amended and charged that Parkins and Burns, and the company through them as its officers, had attempted to perpetrate a fraud upon complainant and the other creditors in this: Parkins and Burns were the sole proprietors of the stock of the company, and were in sole control and management of its affairs, one being president and the other secretary, and on September 16 and 27, 1887, when both must have known that the company was insolvent, they paid to themselves, as salaries, out of the assets of the corporation, sums amounting to $1,500, which sums they had no right to take and which they owe the company, and which it failed to put in its schedule of assets. The liability of Parkins and Burns for the capital stock subscribed for by them is falsely stated in the schedule, because they originally subscribed for $2,000 each, or other larger sums than $1,000, and said subscriptions have been suppressed, destroyed, altered, or done away with, and it has been falsely fixed up by them so as to make it now appear that their original subscription was only for a thousand dollars, and that the other three thousand dollars was taken and subscribed for to be paid in long time notes. Wherefore complainant prays that they be required to pay $4,000 with interest, and that complainant and the other creditors recover that sum.

A preliminary injunction was granted and a receiver appointed. Certain other creditors of the defendant corporation were made parties complainant on November 19, 1887, and on June 12, 1888. Hunnicutt &

Bellingrath and others named as defendants to the bill, made answer or petition, asking to be made parties complainant, and they were allowed to be so made. Among other things, they set up that they did not claim under the assignment; that it was void for the reasons stated in the original bill, and because the schedules were not verified separately; that Burns and Parkins falsely represented to them that the construction company was a *bona fide* corporation legally organized, and relying upon these representations they credited it; that in making these representations, Burns and Parkins in law and equity represented that they, who were the sole stockholders, had subscribed for $10,000 of the stock, and if said representation is false, they are individually and jointly liable to make good the difference between what they paid in and $10,000. Hunnicutt & Bellingrath claimed, as contractors and material-men, a lien for part of their demand upon the property of J. S. Todd for work done and material furnished for said property by them, under contract with the construction company; and they were allowed by the court to assert their lien by amendment.

Burns and Parkins demurred on the following grounds: (1) No equity. (2) Misjoinder of causes of action, seeking to make the construction company liable as a corporation and to subject its assets to the payment of its debts created by contract, and also to hold these defendants individually liable for the same debts on the ground that there was and is no valid corporation, and on the ground of fraud alleged to have been practiced by them. (3) Misjoinder of parties defendant, in that the corporation and its stockholders as such are joined with Burns and Parkins in their individual capacity, on the ground of fraud. (4) The bill and amendments are inconsistent and repugnant, in that in one part the existence of the corporation is re-

lied upon and relief sought on that basis, and in other parts its existence is denied and relief sought on the basis of its non-existence. This demurrer was over-ruled on November 15, 1888 ; and interlocutory excep-tions were filed.

The defendants then moved to refer the case to a master in chancery because it involved matters of com-plicated account, as appeared from the allegations in the bill and answer, which answer defendants had ready then to file in the court and exhibited to the court. This motion was refused, and exceptions were taken. It consumed the whole court week to try the case. During the trial, which began on November 15, 1888, various creditors were made parties complainant over objection of defendants that, as far as judgment was sought against them as stockholders or as individuals, they were entitled to the rule that the trial term was the second term of the case, even where suit was brought twenty days before court, and it was illegal to drive them to trial on the day the suit was commenced. This objection was overruled, and exceptions were taken. During the trial, Burns and Parkins filed an answer to the following effect :

The assignment is valid and should be enforced. They adopt the answer filed by the construction com-pany and Kimball. It is not true that the amount of capital stock taken in the company or the giving of the notes therefor, was kept secret from any of its credi-tors. They acted conscientiously and in good faith all the time, and never attempted to perpetrate a fraud on any of the creditors. The money appropriated by them was for their individual services rendered the company for six months at the rate of $125 per month each, and was no more than their services were reasonably worth. It was not paid them as a dividend or anything of that sort; they were as much entitled to be paid out of the

assets of the company as any other laborer, even if it were insolvent and so known to them, but they did not then know or believe that the company was insolvent. No subscription has been in any way suppressed or destroyed, or in any way done away with or falsely fixed up by them, so as to make it appear different from what it really was at first. The stock notes were not fixed up as an afterthought and in view of a failure, as no failure was then expected or feared, but they were given and received in lieu of stock at a time when the company expected to be successful and prosperous and not to need the payment of the notes, to carry on its business, before their maturity. They each subscribed for $2,000, and were expecting another person to take stock, but he did not do so, and being in doubt whether or not in law it was necessary to have the whole $10,000 stock taken, they naturally agreed with each other that they each would take $3,000 of the stock in case it was in law necessary to make a valid organization of the corporation, but it was not necessary, and they so believed at the time of the organization and during the time the company continued in business; and if they are correct in this, neither of them would be responsible as subscribers or stockholders more than the $2,000, but if in error, and if the company had no legal right to commence business until the whole $10,000 was taken, then they would each be responsible as stockholders for $5,000, or so much of that sum as would be necessary to pay the debts of the company remaining unpaid after all its assets had been first applied towards payment of the same. They did not represent to complainant or to the public that $10,000 stock had been taken or subscribed in the company, and they deny that complainant or others contracted with it on the faith that it had $10,000 taken.

Upon the trial, complainant put in evidence the ap-

plication for charter of the construction company. and
the charter granted May 7, 1887, both of which pro-
vided that "the amount of capital to be employed should
be not less than $10,000 nor more than $100,000 ; and
the company was authorized to commence business
under the charter and to exercise the privileges con-
ferred therein when 10 per cent. of the minimum
amount of capital stock should be paid in." A copy
of the application appeared in full in four weekly issues
of the Atlanta Constitution, a newspaper published in
Fulton county, Georgia, commencing one month before
the charter was granted. Entries upon the stock-
ledger of the company to the account of Parkins were
five shares of capital stock on May 9, 1887, and fifteen
on May 17; and to the account of J. A. Burns, four
shares of capital stock on May 9th, fifteen on May 17th,
and one (E. P. Burns) on May 17th. The ledger, under
the head of capital stock, had the entries: May 9, 1887,
E. P. Burns $100 ; J. A. Burns $400 ; May 17, bills re-
ceivable $3,000; W. H. Parkins $500 ; making $4,000.
Other entries will be referred to hereafter. The com-
plainants also introduced a note of W. H. Parkins to the
construction company for $1,109.60, dated October 8,
1887; six other notes of Parkins to the company, dated
May 17, 1887, each for $250, and due at various dates
thereafter, the last being due three years from date; and
six similar notes of J. A. Burns to said company. Also
a report of the receiver showing, among other things, a
failure to realize as much on the assets of the company
as set forth in the deed of assignment, and that the
assignee had turned over to him, among other things,
when he made a demand for the assets of the company,
the promissory notes of Parkins and Burns above men-
tioned. Also the stock subscription list of the company
dated April 1, 1887, by the terms of which the sub-
scribers agreed "to take the amounts of the capital

stock of the Atlanta Construction Co. for which a char-
ter has been applied for in Fulton superior court, and
to pay for the same when the stock and subscriptions
are called in," containing the names of J. A. Burns,
E. P. Burns and W. H. Parkins, with the entry, "stock
issued and paid for 5 / 9 / 87," opposite each; $400 oppo-
site J. A. Burns, $100 opposite E. P. Burns, and $500
opposite Parkins; and under date of May 1st, 1887,
"J. A. Burns stock issued and paid for 5 / 17 / 87, $1,500;
W. H. Parkins stock issued and paid for 5 / 17 / 87,"
$1,500. Defendants introduced certificates of stock to
J. A. Burns for four shares May 9, 1887, and sixteen
shares May 17, 1887; to Parkins four shares May 9,
1887, and fifteen shares May 17, 1887, and to E. P.
Burns one share May 9, 1887, accompanied by a writ-
ten transfer of the same to J. A. Burns.

A number of the complainants testified to the effect
that they gave credit to the company because they had
seen the advertisement of the application for charter,
and supposed from it that the company was solvent,
but that neither Burns nor Parkins ever told them any-
thing about the capital stock. Others testified that
Parkins stated that the company had ample means to
meet all indebtedness. Others, that Parkins stated,
and obtained credit upon the statement, that the com-
pany had a capital stock of ten thousand dollars, and
credit was given both on the faith of the capital stock
and on the creditors' knowledge of Burns and Parkins
as business men. Others, that they would have given
the credit to Burns or Parkins without knowledge of
what was the capital stock of the company, etc. Ex-
pert testimony tended to show that the books of the
company contained many and unusual erasures, and
that most, if not all of them, occurred in reference
to the transactions of Burns and Parkins with it. One
testified that the books did not show that anything was

v 83-31

paid by Parkins and Burns on the stock except in one case, the transfer of account; and that in the stock-ledger Burns was simply charged with so much stock without any credit, and Parkins so much without any credit, which meant that they agreed to take the stock but did not pay for it. If they had paid the money for the stock, it ought to appear on the other side of the ledger; and from the entries on the ledger on Parkins' account, it did not appear that he had paid anything on account of capital stock at all. On Burns' account it appeared that he had paid in a thousand dollars and drew it out afterwards; it did not appear that any money was paid by him to the company that remained in the company. The books showed that Burns drew out $1,189.36 more than he paid in, and Parkins $738.11 more than he paid in. This did not take into account any amount paid them on account of salary. They were credited on October 1, 1887, with $750 on account of salary, that is, the company was charged with $750 each on account of their services; it was placed to the credit of their account. This salary was credited up two different times, the credit being entered on September 16th of their salary for April, May, June, July and August at $125 per month, and then on October 1st, a $250 credit. From the books it appears that they never paid themselves any salary until September, 1887; then they paid themselves six months' salary. Burns and Parkins never paid for their stock so far as the books show, except by giving notes, and there appear to have been no other stockholders, except E. P. Burns for one share. The entry upon the stock-ledger is presumptive evidence that the person who is debited with this stock has acquired it by paying for it in the usual way. It is not necessary that there should be any entry showing how the payments were made on the stock-ledger; that would occur on the regular

books of the company. When one is debited to capital stock, as was J. A. Burns on the stock-ledger, and subsequently in "open account" renders to the company what the company enters in satisfaction, so that the account is closed, he has paid for the capital stock if they accept what he gives for it. The account is balanced on the books; and as they stand they show that Burns and Parkins paid in full. What would be due would be on the open account, and not for one specific item on the account. The books show that each of the parties who were charged with the capital stock, renders for it "in equivalent" what the company accepted as full payment for it. If there was no controversy between the stockholders and the company, then when a person stands credited for all that he is debted, his account is closed and he does not owe anything strictly as between the members of the corporation; but the creditors of the concern would have the right to know how the stock was paid for, whether money came into the concern. Witness did not know that any of the erasures showed that Burns and Parkins took any more stock than they were charged with; it was his impression, after a careful examination with the aid of a glass, that there had been entries as to stock which had been erased; outside of the erasures the books presented a fine appearance and were correct as to figures.

J. A. Burns testified : Was secretary and treasurer of the corporation, and Parkins was president and general manager; I kept the books of the company. After the company was incorporated, the corporators accepted the charter, and after the company was organized, it engaged in the general business of building and repairing. Minutes of the organization were kept. I paid $400 cash on my subscription to stock, Parkins $500, and E. P. Burns $100. When the company was first talked about and its organization agreed upon, and ap-

plication was made for charter, it was agreed between Parkins, E. P. Burns, a Mr. Harbeck and myself that each would take one third of the capital stock of $10,-000, except $100, which was to be taken by E. P. Burns; and after the charter was applied for, Harbeck notified us that he could not take his part of the stock. 10 per cent. had already been taken and paid up in cash at the time the charter was accepted. Parkins and myself then each took $1,500 more, to be paid in instalments of $250 each, and gave our notes to the company. At the same time, we agreed to take each $3,000 more, should it become legally necessary to effect organization and enable the company to go on doing business. Then we commenced business. We consulted our attorney, and he did not think it was necessary to make any further subscriptions. The money collected was deposited to the credit of the company; the notes were retained by the company, and were considered good. Witness had to do the bookkeeping between times, as he could catch time out of the office, and took the books home with him at night. To save taking two books home and the difficulty of working with two books spread out on a small table, he would take the journal alone and from that run through and make entries on little slips of paper, which would represent ledger account, and posted them on the ledger. In the daytime, as he had opportunity, he would transcribe these slips to the ledger, and after completing the transcribing destroyed the slips. Sometimes he would make an entry or part of an entry and be called out, and upon his return would recommence the work. These slips were distributed through the ledger when he wanted to open the accounts; and in binding the ledger some of these slips got misplaced, he supposes; and after being transcribed and a trial balance taken, he found that he had in some instances got the same

accounts entered twice, and that in writing up the journal from vouchers and memorandums, he had in some instances duplicated the entries or parts of them, on different pages. He then changed and corrected the journal entries so as to make them conform to the facts, and where there were duplicated ledger accounts, left one and cancelled or erased the other, if only a small one, so as to make the books correctly exhibit the transactions of the company. It was expected that the profits of the business would be sufficient to pay the notes given for stock as they became due, and witness and Parkins regarded themselves as responsible for the amounts, and at the time they were given, did not suppose there would be any creditors who would have any rights in them or question them. These notes were deposited with the company and held by it as part of its assets up to the time its property was turned over to the assignee. The notes were made up at the time the stock was taken, which was at a meeting of the company held May 17, 1887. Money was drawn out temporarily by witness and Parkins, and was afterwards returned. At the time the assignment was made, Parkins was due the company, for money advanced to him and not returned, about $1,100, which was covered by the note he gave, which note was a part of the assets of the company at the time of the assignment. Witness and Parkins were each allowed by the company a salary of $125 per month, and they were reasonably worth this sum, as they devoted their whole time to the business of the company. They drew money from time to time as they needed it, and after a time were credited with the amounts they were entitled to for their services, the entries being made when witness was going over the books and straighening up the accounts, as he did when opportunity offered. He never made any representations to any of the creditors of the company in regard to the

amount of the capital stock subscribed and paid in while the company was carrying on business. After the assignment was made, he told the secretary and treasurer of the original complainant that $4,000 of the capital stock had been subscribed for and paid in. The agreement as to the six thousand dollars of unsubscribed stock was made when the organization of the company was being perfected, and was conditional as above stated. Their attorney's opinion was, that it was not necessary for them to take this stock, but that it might be necessary, and in view of that contingency they agreed to take it if it became necessary. They regarded that it would be necessary whenever any liability occurred on it, but did not determine upon any definite time. At the meeting of the stockholders at which it was determined to accept the long time notes, only witness and Parkins were present, and witness thinks the matter was acted upon by motion and vote. His recollection was, that there was formal action of the corporation accepting the notes; that he made the motion, Parkins seconded it and he and Parkins voted for it; but he does not recollect exactly the whole transaction. Parkins presided and he acted as secretary. If a formal motion was made and carried accepting the notes, he might have omitted it from the minutes from inattention or overlooking it, and if it does not appear on the minutes it was from inattention. The company was not in process of making an assignment and was not contemplating an assignment when Parkins gave the $1,100 and odd dollar note to settle up what he had drawn; expected at that time to realize on a sufficient amount of assets to enable them to go on, but found it could not be done, and the assignment was made. It is untrue that all the cash that witness paid into the company came back to him. He returned to the company all that he got from it, counting as a credit the

amount he had drawn as salary. On June 30, not crediting his salary up to that time, he had paid in $2,880 and had received in stock and money $2,561.83. The salaries were fixed when the organization of the company was first made, and were drawn monthly, but were not credited, being just one of those things that were allowed to run along. Witness thinks Parkins possessed some property; did not know he was insolvent, supposed he was solvent; it was known that he was a man of no means in his own name. Did not know that he was not good for his subscription of $1,500, but supposed that he was perfectly responsible; at the time, he had in his own name a house that he was living in, upon which he had made some payments, and also had an interest in a business in which he had formerly been engaged, and witness had become acquainted with the fact that there were some $2,000 or $2,500 assets in that business which belonged to him. From his knowledge of Parkins' condition, would consider a $500 five years' note by him a good one; had the money himself, and would have loaned it to Parkins. Thinks Parkins wanted a little longer time than he might be entitled to, but Parkins said to make a note that way and he would sign it; that he expected to be able to pay it in a short time; that he expected to get the money from the assets of the former business and settle it up. At the time his $1,100 five year note was taken, witness was not aware that there would be any question about any creditors coming into possession.

W. H. Parkins testified: Was president and general manager of the outside work of the company; and paid $500, besides his note, on his stock, at the time of the organization or shortly afterwards. As to the $6,000 to make up the $10,000 of stock, his testimony was substantially the same as that of Burns. He never told any one as to the amount of capital stock, and no

one ever asked him about it. Never found it necessary to solicit credit, and never found any trouble in obtaining it. Did get money from the company more than he paid into it, but covered it by his note for $1,100 and some odd dollars, and that was after allowing him credit for his salary of $750. As to the agreement with regard to the $6,000 balance on the capital stock, he and Burns just simply had a meeting in the office, and the thing was talked over in a business-like way. It might be called a uniting between him and Burns, just an agreement between him and Burns, or a meeting. It was the same as all the other transactions that were made, the same as the $250 notes; that was done in the same way. Does not remember whether any resolution or vote was taken in regard to accepting those notes for money; he and Burns agreed to it. They agreed to take notes for $250 each, beginning eighteen months after the notes were made. Witness had nothing to do with the books, and knows nothing about the erasures. Considered himself solvent as to the amount of stock he took both for the $500 and the $1,500, because he had the house and lot on which he had made payments of nearly $2,000, but which he does not own now. That was about all he had. In the former business referred to by Burns, in which witness had been engaged, he had from $1,800 to $2,500, but failed in getting most of it on account of bad debts.

Upon questions submitted to the jury, they found various amounts due to the various complainants by the company; that its capital stock under its charter was $10,000, of which J. A. Burns took $1,900, Parkins $2,000, and E. P. Burns $100, which he transferred to J. A. Burns May 16, 1887; they made no cash payment thereon, nor was 10 per cent. thereof paid in cash before the company com-

menced business, nor was more than $4,000 subscribed for, nor was it a legal corporation when it so commenced; that $1,500 each with interest from May 17, 1887, are now due by Burns and Parkins, for which they each gave six $250 notes; that $750 principal and $61.62 interest are due by J. A. Burns, and $1,359.61 principal and $110.33 interest are due by Parkins to the company outside of obligations for stock; that the assignment made to J. C. Kimball·is not valid; that the value of the company's assets at the time of making it, not including the unpaid stock, was $1,016.67; that $141.67 was due the company from defendant Todd, and on this Hunnicutt & Bellingrath had a materialman's lien; and Burns and W. H. Parkins are not liable to the company jointly on account of capital stock not subscribed for, but are severally liable to it for $3,000 principal and $315.22 interest each on this account. Decree was entered. Parkins and Burns moved for a new trial on the following grounds:

The verdict is contrary to law and evidence, and is illegal in so far as it finds for certain named complainants at or before the appearance term (as to them), defendants not consenting that the case be tried then; and the answers to questions are contrary to evidence and law, and are inconsistent.

Erroneous charge: A corporation would not have the right, however, to pay to the stockholders, or any of them, in the name of salary, any amount which would have the effect to reduce the capital stock of the corporation as actually paid in. If, therefore, you find that Mr. Parkins and Mr. Burns received each the sum of $750 as salaries, and that the effect of the payment to them of those amounts as salaries was to reduce the capital stock as paid in, it would be your duty to hold them chargeable for such amounts as they thus drew from the capital stock. In case of Mr. Parkins, you

should charge him with the amount of his promissory note, increased by the amount he may have drawn out in this way, if the evidence shows that he did draw out any this way.

Erroneous charge: It appears by an inspection of the deed of assignment that only one affidavit was executed by the president of the corporation. I therefore instruct you that the assignment is void, and it will be your duty so to find in answer to this question.

Refusal to charge: If the jury should find that Burns and Parkins are not entitled to retain the $750 paid to each of them for their salaries, and that they should now be held liable for the same, then these two sums should be included as part of the assets of the Atlanta Construction Company, and be valued in finding the value of said assets at the time of the assignment under question.

The answer to the 20th question is illegal and contrary to evidence in so far as interest is found against movants from October 10, 1887.

Refusal to charge: If Burns and Parkins rendered service to the corporation in its business, they had the right to be paid for their services as much as such services were reasonably worth, as shown by the evidence.

Error in admitting in evidence four issues of the Constitution newspaper, containing what purported to be an application for charter for the Atlanta Construction Company. These papers were admitted to show the amounts of capital stock of the intended company, and that the same had thereby been brought to the notice of the public and especially to the notice of the complainants. Defendants objected on the ground that, as to the amount of the stock, the charter was the best and only evidence, and that such a publication was not an admission of a fact, to wit, the existence or

amount of stock, but evidence only of a purpose or intention which may never have been realized.

Because the court permitted certain persons to be made parties complainant pending the trial, and to obtain judgment not only against the company, but against movants individually; over objection that this was illegal and unusual, and that they could not be made liable in that way without regular suit against them, and then only at the second or trial term.

Error in permitting a witness to be asked whether he had any intimation of the company being a corporation and having capital stock, and if so, what amount; defendants objecting on the ground that, as a creditor's bill, the case could only proceed against the assets of the corporation, and Burns and Parkins could not be held individually liable in this suit, or for fraud. In answer to the question, the witness testified that he gave credit to the corporation on the faith of its being a legal one and had capital stock as indicated in its advertisement, which he saw.

The court charged: If you find that these defendants, Burns and Parkins, are liable for any amount of stock that has not been taken up, it will be proper for you to allow the complainants interest upon said amount of stock from the time this suit was filed up to this date. The same ruling would apply to any stock that was subscribed for and then not paid.—Error, because defendants are not liable for any interest until after the amount of their liability, if any, is fixed and made definite.

In August, 1888, complainants' attorney was presented with the demurrer. When the case was called in order for its trial in November thereafter, defendant's counsel announced to the court that they had a demurrer to the bill undisposed of, and that the case was ready only for the hearing of the demurrer. Coun-

sel for complainants insisted that the case go on the trial calendar, and that the demurrer should be heard then also. The court so ordered, and set it down for trial. On the day appointed, the demurrer was heard and overruled. Defendants then moved to continue the case in order to get up evidence to support their answer just then filed, and the court refused the continuance, which was error.

Error in refusing to refer the case to a master, it being a matter in issue, among other items of account, as to what was the value of the assets of the corporation at the time of the assignment, and there being various other items and matters of account involved.

The court ordered a new trial unless complainants should write off $500 from the amount found against Burns, which was done, and the motion for new trial stood overruled. The defendants excepted; and the complainants took a cross-bill of exceptions, not now material.

E. N. BROYLES, for plaintiffs in error.

N. J. & T. A. HAMMOND, TOMPKINS & BRANDON, MAYSON & HILL, MILLEDGE & BLALOCK, SIMMONS & CORRIGAN, HALL & HAMMOND and WILL. HAIGHT, *contra*.

BLECKLEY, Chief Justice.

1. There was no error in overruling the demurrer to the bill as amended. Burns and Parkins, both being officers of the corporation and the only stockholders therein, held out the corporation to the world as duly organized; whereas, according to the allegations of the bill, all the stock had not been subscribed for, nor had ten per cent. thereof been paid in. The corporation, therefore, was one *de facto* only, and had no legal right to transact business or to obtain credit. It did obtain credit, however, and this it did by reason of the wrongful acts of Burns and Parkins in setting it on foot pre-

maturely and holding it out as duly organized. This was a legal fraud committed by them, and rendered them liable to respond to the corporation creditors, to the extent at least of the capital stock that should have been subscribed and paid in, in the event the corporation assets proved insufficient to discharge its liabilities. Moreover, they acted with and for it in devising, promoting and executing the alleged fraudulent assignment of the corporate property. Taking the allegations of the bill, therefore, as true, they were connected with the corporation through fraud at both ends of its career, and throughout the whole intervening space. They were the real active agents, both in its misbeing and misdoing. Indeed, it was but a formal machine which they manipulated for their own benefit as officers and stockholders. We think there was no multifariousness—no misjoinder of parties defendant or of causes of action. *Schley* v. *Dixon*, 24 *Ga.* 273. The bill having for one of its objects the attack of an assignment as fraudulent, the complainants could proceed without first reducing their claims to judgment. Acts 1884–5, p. 100.

2. It was not incumbent on the court, as matter of unconditional legal duty, to refer the case to a master in chancery; but the expediency of so doing was discretionary with the presiding judge. The court may refer any part of the facts to a master, but is not bound to do so. Code, §§3097, 4202. *Martin* v. *Foley*, 82 *Ga.* 552. Considering that there was a schedule of the corporation liabilities annexed to the deed of assignment, which showed what was due to each creditor, there was no occasion to refer that part of the case to an auditor, under section 3137 of the code; besides, the application to the court was for reference to a master in chancery, not to an auditor. And beyond ascertaining the corporate liabilities, the case was not one in-

volving account in a strict sense. The corporate assets could be collected in from time to time, even after final decree, and without their amount being ascertained beforehand. The bill was for an accounting by the corporation, its officers and stockholders, with the creditors of the corporation, not for an accounting between the corporation and its debtors.

3. The bill was a creditor's bill, filed in behalf of all the creditors of the corporation who might choose to come in and be made parties. Some of them delayed coming in as complainants until after the trial was in progress; but all these were acknowledged creditors, their names and the amounts due them being shown by the schedule annexed to the assignment. There can be no doubt of their right to be made parties ; and no cause for continuing or delaying the case on account of their late appearance was suggested, save that the defendants, or some of them, had a right to another term as to these new parties. We think, under the peculiar circumstances, there was no such right.

4. The charge of the court to the effect that the assignment was void because the schedules were not verified each by a separate affidavit, was correct, according to the ruling of this court in *Fort* v. *Martin Tobacco Co.*, 77 *Ga.* 111.

5. Whilst there may have been considerable conflict in the evidence, the various findings of the jury as to matters of fact were all warranted by the testimony, in so far at least as to make it improper for this court to interfere, the trial judge being satisfied. The mistake in finding, in answer to the 20th question, that the liability was to the corporation instead of to the creditors, is of no practical consequence; nor is it material whether the amounts retained for salary be counted as corporate assets or not. The recovery should be and is by the creditors, and payment to them will be a discharge.

No decree has been or should be rendered in favor of the corporation.

6. The controlling question of law is as to whether Burns and Parkins (assuming these various findings of fact to be true) are liable for the debts of the company to the extent of the minimum capital stock named in the charter. We can discover no reason in law or in morals why they are not so liable, for it is evident that the corporation was a mere shadow without substance. It was a thing of form—and to that extent a thing of fact,—but financially it was utterly empty, and was so from the time of its birth. As it was used by its progenitors, these two stockholders and officers, to obtain credit, not only up to the amount of its nominal capital stock but for much more, it seems to us both just and legal to hold them responsible to creditors for these debts up to the measure of the amount which they should have had subscribed and paid in ultimately had they violated no law in setting the corporation on foot and using it as a business instrument. And we think it mild, instead of rigorous, to make each of them respond for half of the capital they should have had subscribed before commencing business, together with interest upon the same. Their liability being grounded upon legal fraud, interest upon the principal is a reasonable consequence of their fraud, in holding them to measures of redress. As the credit which they obtained for this penniless illegal corporation extended far beyond the whole measure of redress which is being exacted for the fraud, the capital stock, or rather the substitute for it which these persons are required to furnish, ought to be the equivalent of cash capital paid in full when the corporation was organized; and to arrive at this equivalence it is necessary that they should be charged with interest from that time. It seems from the record that they have been charged with interest on

most of their liability from the commencement of this suit only, which is more favorable to them than would be the more strict and correct rule of computation.

7. As to the right of these persons to retain the $750 drawn by each of them as salary for their services rendered the corporation, we should have no doubt of it provided the corporation had made profits out of which to pay the same. But inasmuch as it does not appear that any stage of its existence the corporation had assets in excess of its liabilities, the appropriation of its assets to pay its officers was simply the withdrawal of so much of the corporate effects from application to its debts. To uphold this would be simply to make the creditors discharge the salaries of the officers of the corporation to which they had extended credit. It would seem almost ludicrous to hold that a man might have himself incorporated, contract debts in his corporate capacity without investing a dollar of his own capital, transact business, and out of the proceeds pay himself a salary, instead of first paying the debts which in his corporate character he had contracted. It seems to us that no man can expect his creditors to run him as a corporation any more than as an individual.

8. We have gone over the numerous other points in the motion for a new trial, and find in them no reversible error. Indeed, so far as we can determine without indefinite study, they are free from error of any kind:

The judgment in the main case being affirmed, the cross-bill of exceptions is dismissed.

*Judgment affirmed.*